WALTNER, Respondent v. EDUCATIONAL MUTUAL
BENEFIT ASS'N., Appellant

(284 N. W.776.)

(File No. 8174. Opinion filed March 22, 1939.)

*Van Slyke & Agor,* of Aberdeen, for Appellants.
*Alan Bogue,* of Parker, for Respondent.

POLLEY, J. Action to recover on a life insurance policy that was issued by defendant to Mrs. Lydia Waltner. The plaintiff, Peter J. Waltner, was the husband of Lydia Waltner, and the beneficiary named in the policy. The defendant is a Mutual Assessment insurance company. No medical or physical examination of the insured was required by the defendant and the validity of the policy was made to depend upon the truthfulness of the material statements made in a questionnaire.

Questions numbered 12, 13 and 14 of the questionnaire are as follows:

No. 12: "Q. Have you within the past five years received medical or surgical advice or treatment? A. Yes.

"Q. Name and address of attending physician. A. Dr. Clark, Sioux Falls, S. D.

"Q. Illness? A. Female trouble.

"Q. Date? A. Sept. 1935.

"Q. Duration? A. One week.

"Q. Results? A. Fully recovered."

No. 13: "Q. Have you any impairment of sight? A. No.

"Q. Hearing? A. No.

"Q. Deformity? A. No.

"Q. Amputation? A. No.

"Q. Physical or mental disability? A. No.

"Q. Any other impairment? * * *"

No. 14: "Q. Are you now in good health and have you been so for the past five years? A. Yes."

"* * * I hereby certify that the above answers and statements are made by me, that they are correctly and fully recorded, and that no material circumstance has been withheld or omitted concerning my past and present state of health, family history and habits of life."

"* * * (b) I hereby declare that I have read all the foregoing questions and answers and that all such statements and answers as written or printed in this application are full, complete and true, whether written by my own hand or not, and I agree that they are to be considered the basis of any insurance issued hereon. I further agree that if it should develop that I have misrepresented any material fact covered by the foregoing statements and answers, or have failed to give full disclosure of any material fact, then any policy issued hereunder shall be null and void. * * *

"(Signed) Mrs. P. J. Waltner (Lydia).

"Dated Aug. 5, 1936.

"At.................,"

The policy was issued and went into effect on the 7th day of August, 1936. On the 1st day of March, 1937, the insured showed symptoms of a mental disturbance and was removed to the Yankton Hospital where her trouble was diagnosed as "manic depressive psychosis," and as a result of such disease she died on the 22d day of the same month. A claim for the insurance was made, but was refused by the defendant, and this action was brought to recover on the policy.

 The policy provides that money with which death claims are to be paid must be raised by assessments on the membership of the company and we are met at the outset by a motion by the defendant that the case be transferred to the equity side of the calendar and tried as an equity case—this for the purpose of compelling the defendant to levy the assessment necessary to raise the

money with which to pay the claim, in case the defendant is held liable. We find no error in the denial of this motion. The policy provides for the creation of a "special reserve fund," and further provides "that such fund or any part thereof may be used for the purpose of paying death or indemnity claims in case of emergency or necessity, pending the making of regular assessments for such purpose." Section 3, ch. 133, Laws 1935. It does not appear that the reserve fund was not sufficient to pay this claim and that no assessment would be necessary. But in case the reserve funds were not sufficient to pay the claim the assessment could be made after the amount of the liability had been established by the action at law.

▆▆▆▆ It is contended by defendant that the insured misrepresented the condition of her health in her application for the policy, and that she failed to correctly give the names of all the doctors she had consulted for the past five years. In question No. 12, where she is asked what physicians she had consulted within the past five years, she gave the name of Dr. Clark only, of Sioux Falls. As a matter of fact she had also consulted and been treated by Dr. Stenberg of Sioux Falls, besides having consulted the family doctor, E. J. Hofer of Freeman. The trouble for which she was treated was designated "female trouble," but it was not regarded as serious by any of these doctors, nor by herself. She does not appear to have believed that she was sick, and during the five year period prior to signing the application she did her own house work ,and took care of her children, two of whom attended school, and also gave birth to one child. She was described by one of the physicians as a "strong, robust young woman." It is not shown that any of her trouble, either before or after the issuance of the policy, was the cause of, nor in any way conducive to the disease, "manic depressive psychosis" from the effects of which she died on the 22d day of March, 1937. Under these circumstances it cannot be said that, as a matter of law, the inaccuracies made by the insured in the questionnaire are material and there was no error in submitting the materiality of these facts to the jury. The policy does not expressly provide that misrepresentation of the matters set forth shall avoid it. Section 1431, Rev. Code 1919. Rumbolz v. American Alliance Ins. Co. of New York, 61 S. D. 334, 249 N. W. 316. Good health as the same is used in

insurance applications and insurance policies does not mean perfect health or to be free from all minor ailments. In New York Life Ins. Co. v. Wertheimer, D. C., 272 F. 730, 731, the court in defining "good health" used the following language: "The expression 'good health,' or 'sound health,' thus used in life insurance policies, it is uniformly held, means a state of health free from any disease or ailment that affects seriously the general soundness and healthfulness of the system, and not merely such temporary disturbances or disorders which yield readily to treatment and do not tend to weaken or undermine the constitution."

And in Life & Cas. Ins. Co. v. King, 137 Tenn. 685, 195 S. W. 585, 588, it is said: "The terms 'good health,' when used in a policy of life insurance, means—'that the applicant has no grave, important, or serious disease, and is free from any ailment that seriously affects the general soundness or healthfulness of the system. A mere temporary indisposition, which does not tend to weaken or undermine the constitution, at the time of taking membership, does not render the policy void'." And cases cited.

Under these definitions the jury was justified in determining that this answer was immaterial.

This case is not like the Damgaard case, Damgaard v. South Dak. Ben. Soc., 62 S. D. 533, 254 N. W. 924; nor the Hohenthaner case, Hohenthaner v. Mutual Life Ins. Co., 62 S. D. 8, 250 N. W. 370. In the Damgaard case the insured stated at the time she applied for the policy that she was in "good health." On the strength of this representation the policy was issued. On the trial it developed that the insured had, for more than a year been afflicted with "endocarditis" and had been taking treatment for her heart and that both the insured and her beneficiary knew at the time the application was made that she was not in "good health." The policy was issued on the 1st day of November, 1932, and the insured died from the effects of endocarditis on the 26th day of December, 1932. We held that, as a matter of law, the policy was obtained by fraud and was void.

In the Hohenthaner case the insured consulted Dr. T. F. O'-Toole on the 31st day of August, 1931. He said he had a pain in the upper righthand region of his abdomen that had been causing him pain for something like six days. The doctor found that insured had a bunch or growth of considerable size in the

region indicated. The doctor did not say at the time what he thought the growth was but told insured to return in a week or ten days and let him make a further examination. On the 2d day of September, 1931, insured applied for the policy of insurance involved in that case. He was sent to the insurance company's examining physician for a medical examination. He made no mention to this physician of the growth in his abdomen found by Dr. O'Toole and the examining physician did not find such growth. To the question, "state every physician or practitioner who has prescribed for or treated you, or whom you have consulted in the past five years for any ailment, serious or not serious? Name of physician or practitioner, address, when consulted, nature of complaint, he answered 'None'." Upon the strength of assured's answers a policy was issued to him on the 18th day of September, 1931. The growth in assured's abdomen proved to be a cancer which caused his death on the 18th day of January, 1932. We held this policy was obtained by fraud as a matter of law and was void.

 In this case the court instructed the jury that if the plaintiff was entitled to recover, their verdict should be for the maximum amount named in the policy, $2,500. This, we believe, was error. The policy contains the following provision: "Any policy becoming a claim by reason of death of a member between the ages of 15 and 40, (assured was 35 at the time of her death) shall carry a maximum value of $2500.00."

"In the event the membership is below 2500, then the amount payable is dependent upon the amount collected from an assessment to meet said claim. From this provision it is plain that the maximum amount of $2,500 is not due on the policy unless the membership equals 2500. In two separate places in the policy and in one place in the application we find the following provision: "It is understood and agreed that the amount to be paid when this certificate or policy becomes a claim shall be dependent upon the amount to be collected from an assessment to meet such claim."

In order to emphasize this provision, each time it appears in the application or policy, it is printed with red ink. It is shown by the defendant that the membership did not exceed more than about one-half of 2500. This fact will reduce the amount of plaintiff's claim proportionately. It is shown by the undisputed evi-

dence that at the time of the decedent's death, the membership was only 1234. With this membership the highest possible amount of recovery would be $1,110. If within twenty days after this opinion is filed, plaintiff will remit the difference between $1,110 and $2,500, the judgment as so corrected will be affirmed without costs to either party. Otherwise, the judgment will be reversed and a new trial granted.

All the Judges concur.